GULF TRANSPORT CO. *v.* ALLEN, et al.

In Banc. May 22, 1950.

No. 37494 (46 So. (2d) 436)

Robert G. Gillespie and J. Knox Huff, Jr., for appellant.

M. V. B. Miller and Gerald Adams, for appellees.

**Lee, J.**

The surviving husband and children of Mrs. Nettie Allen brought suit against the Gulf Transport Company to recover damages for her alleged wrongful death. From a jury verdict and judgment for $25,000, the Transport Company appealed.

One alleged error assigned is that the verdict was contrary to the overwhelming weight of the credible testimony. Thus, a recital of the substantial facts is necessary.

Mrs. Allen lived near Whynot, a rural community in Lauderdale County, about eleven miles east of the City of Meridian. She had been to the City, and was a passenger on a bus of the Transport Company on her way back home. It was a rainy day. The bus stopped on the south side of the road, opposite Booker's Store, and off of the pavement. Mrs. Allen disembarked, and while trying to cross to the other side, was run over by the bus and killed.

The circumstances attendant upon, and the manner of, her death were in dispute. The length of the stop was estimated by the plaintiffs' witnesses at one minute, while those for the defendant put the time from one and one-half to five minutes. All agreed that three passengers disembarked; Mrs. Allen, Frank Welch and his wife, Lila, and in that order. Frank said that he was just behind her, and that she walked around the front of the bus; and in about half a minute, the bus started. Immediately his wife said: "Ain't that Miss Nettie?", and he saw her under the bus before the right wheel ran over her. He raised his hands, trying to flag or stop the bus. Level Molpus, across the road and watching another man fix a flat, saw Mrs. Allen get off and go right in front of the bus. It started off, and he hollered "Whoa, Whoa," and threw up his hands and waved to the driver because she was in front of the bus. Eris Culpepper, inside the store looking through a window, saw Mrs. Allen get off and walk four or five feet in front of the bus, going across the road to the store. She had traveled about one-half of the width of the bus, when it started. It was close on her, and she jumped backwards after it started.

The evidence of the defense witnesses as to the length of time of the stop, and Mrs. Allen's being the first to get off, were calculated to show that she had ample time to cross. They drew the inference that because of some blood on the right rear fender, she might have fainted or fallen into the side of the bus. But, this conjecture pales in the face of so much direct testimony to the contrary. The driver knew that she had left the bus, but admitted that he did not know where she was and that he never saw her again until she had been run over. He further admitted that, if she was as much as four feet in front of the bus, he would have seen her. He testified that he glanced in the rear mirror, looked forward and pulled away slowly. He felt the bus jar, and then looked in the mirror and saw her behind the bus. He stopped im-

mediately, ran back and saw Mrs. Allen, and exclaimed: "Oh! my Lord, I ran over that lady."

The plaintiffs, by their evidence, maintained that, when Mrs. Allen left the bus, she was crossing over in front of it, and that the driver neglected to keep a lookout for her, and, on that account, negligently ran the bus over her and killed her. The defense, by its evidence, affirmed that the driver did not see her after she had disembarked; that he kept a reasonable lookout; and that her death resulted because she placed herself in a position where she could not be seen.

██ Thus, on these disputed facts, the issue was one clearly for the jury. And, they were fully warranted in finding that (1) Mrs. Allen, after alighting from the bus, was never out of the range of the driver, before he struck her; (2) that slight attention on his part would have disclosed her presence and danger; (3) that the threatening weather would cause passengers to cross over to the store as quickly as possible, either in the front or the rear of the bus; and (4) that it was negligence to start the bus quickly before making a proper lookout to ascertain where the passengers were. B. Kullman & Co. et al. v. Samuels et al., 148 Miss. 871, 114 So. 807; Ulmer v. Pistole, 115 Miss. 485, 76 So. 522; and Rhodes v. Fullilove, 161 Miss. 41, 134 So. 840, 841.

██ The second alleged error was the giving of the only instruction for the plaintiff on the merits. The appellees charged in their declaration that the Transport Company was under the duty to exercise a high degree of care for her safe discharge and to look out for her safety; that it failed to exercise such care and keep such lookout; and that her death was proximately caused by the failure to keep a proper lookout for her safety, and starting the bus before she had an opportunity to reach a place of safety where the bus would not strike her. A defense instruction eliminated "high degree", and imposed only "reasonable care." The instruction complained of announced that it was the duty of the driver

"to always keep a careful lookout and to use every care and caution for the safety of Mrs. Allen that a reasonably prudent and careful person would use under like circumstances," and if they believed from a preponderance of the evidence that the driver "failed so to do, and such failure was a proximate cause of the death," then it was their duty to find for the plaintiffs. This instruction presented the sole issue in the case.

Besides, defendant's other instructions provided that if, in the exercise of reasonable care, the driver could not and did not see her, or, if he was unable to see her from the driver's seat, or, if he was unable to see that she was in a position where the bus would run over her, the jury should find for the defendant.

Thus, it will be seen that under these instructions, no liability attached until the jury had found that Mrs. Allen's death was caused by the driver's failure to keep a reasonable lookout. Taken together, these instructions were in harmony, and correctly announced the Law. Lamar Hardwood Company v. Case, 143 Miss. 277, 107 So. 868. We do not notice the placing of a comma between "such" and "failure" as too hypercritical. St. Louis & S. F. R. Co. v. Ault, 101 Miss. 341, 58 So. 102, 104.

Complaint is also made of an instruction granted the plaintiffs on the measure of damages. There were two instructions on this phase. The first was a rescript of an approved instruction. Gulf Refining Company v. Miller et al., 153 Miss. 741, 121 So. 482. ██ ██ The instruction complained about announced the same general principle, and informed the jury that they "may take into consideration the value of the services of Mrs. Allen, if any, to her husband, the value of her association, society and companionship to Mr. Allen, also to Mrs. Carr, Otis Allen and Garland Allen, if any." This was in accord with Avery v. Collins, 171 Miss. 636, 157 So. 695, 158 So. 552, and the many cases there cited.

The last error assigned is that the verdict is excessive.

In a description of Mrs. Allen, after death, some of the witnesses testified that her head was "mashed as flat as a pancake." This, of course, showed an instantaneous killing, which precluded any recovery for pain or suffering. The defendant obtained the usual instruction on contributory negligence. But owing to the size of the verdict, we assume that the jury found that she was free from negligence.

It is elemental that a husband is entitled to the services and earnings of his wife. 27 Am. Jur. 66; 41 C. J. S., Husband and Wife, Section 17, page 413. It is further beyond peradventure that the surviving husband and children are entitled to recover for the loss of society and companionship in the death of their wife and mother, excluding, of course, damages by way of solatium. Gulf Refining Company v. Miller, supra; Avery v. Collins, supra, and the cases there cited.

Mrs. Allen was seventy-two years old, in good health, vigorous, and able to do hard work. She was five feet in height, weighed only ninety pounds, and had no rheumatism, high blood pressure, or heart trouble. Her husband was eighty-two years old, and in good health. Under normal expectancy, she would live eight or nine years, and he, four or five years. Of course, the children, being under fifty years of age, and in good health, could reasonably be expected to survive both their mother and father.

She did the normal work of a farm wife: cooking, housekeeping, washing, ironing, raising chickens, gardening, canning, milking, and sold milk, butter and fresh vegetables. The services which she rendered to her husband, and her contributions to his support and maintenance were valuable indeed. They possessed a substantial monetary value, well known to average men, such as sat on the jury, without specific itemization in dollars and cents. It is common knowledge that even household serv-

ices, if performed by a domestic servant, would have entailed a substantial weekly or monthly outlay of money. This Court, in former decisions, in passing on the size of verdicts in comparision with others, took note of inflationary conditions in the country, with the consequent decrease in the purchasing value of money. Laurel Light and Railway Company v. Jones, 137 Miss. 143, 102 So. 1; Cotton Mill Products Company v. Oliver, 153 Miss. 362, 363, 121 So. 111; St. Louis-San Francisco R. Co. v. Dyson, Miss., So. (2d) 95; and Gordon v. Lee, Miss., 43 So. (2d) 665.

Mrs. Allen was a model wife and mother. Her children lived near by; they sought her advice and it was helpful to them. She was a devout church woman, and kept the family ties close. She and her husband had lived happily together in peace and harmony for more than fifty-one years. At his advanced age, he would hardly form new relationships,—no one could take her place with him. The jury likely found that the loss of her services, society and companionship was so great as probably to mean a slow death sentence for him.

The factors which control the amount of the verdict strongly support one for a substantial amount. The record bespeaks that the case was well and fairly tried. Due regard must be given to the verdict of the jury and the judgment of the trial judge, on the motion for a new trial, that the verdict was not excessive.

The whole Court agrees that the verdict in this case is a large one. But a majority of the Judges think that, under all of the circumstances, it is so large as to be excessive by $7,500. Cf. B. Kullman & Co. v. Samuels, 148 Miss. 871, 114 So. 807.

Consequently, if the appellees within ten days shall enter a remittitur for $7,500, the judgment will be affirmed for $17,500; otherwise, the cause will be reversed and remanded for a new trial on the question of damages alone.

Affirmed with remittitur.